## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

UNITED STATES OF AMERICA                                    PLAINTIFF

V.                                        CAUSE NO. 3:13-CR-59-CWR-LRA-2

LEMARKCUS KELLY                                             DEFENDANT

### MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Lemarkcus Kelly's *Motion for Release*. Docket No. 138.

For the following reasons, the Motion is granted.

### I.      Background

Lemarkcus Kelly is currently serving a 97-month sentence at the Bureau of Prisons (BOP)

low security facility in Oakdale, Louisiana (Oakdale I). The Court sentenced (then 22-year old)

Kelly in January 2014 after he pleaded guilty to one count of possession of an unregistered

destructive device, specifically a "Molotov Cocktail." At his sentencing, Kelly further admitted to

"shooting a firearm into an unoccupied building." Docket No. 119 at 9. No one was harmed during

the shooting.

At the time of his sentencing, Kelly was the father of three children, the oldest being three

years of age. Docket No. 92 at 14. He worked at a local restaurant to provide for his children. He

had also finished his GED and taken classes at Hinds Community College. Since his sentence

began, Kelly has taken advantage of educational programs and other rehabilitative opportunities.

Docket No. 144-1. Outside of one violation in December 2014, Kelly maintains a clean record and

has earned 324 days in earned Good Conduct Time. *Id.* at 1–2. With his Good Conduct Time and

215 days of jail credit, Kelly's expected statutory release date is May 18, 2020. *Id.* at 1.

The recent death of Patrick Jones, another man incarcerated at Oakdale I, arguably set off the events which led to the instant motion. On March 19, 2020, Jones complained of a persistent cough.[1] He was "transported to a local hospital for further treatment and evaluation,"[2] where he tested positive for COVID-19, the respiratory disease caused by the novel coronavirus SARS-CoV-2. Nine days later, he "was pronounced dead by hospital staff" after succumbing to COVID-19.[3] Since Jones' death on March 28, 2020, 33 prisoners and 17 staff at the facility have tested positive for COVID-19.[4] Seven prisoners have been killed by the virus.[5]

Oakdale I, along with one other facility, has the highest number of prisoner deaths in the BOP thus far.[6] The situation prompted the Office of the Attorney General to issue a memorandum to the BOP director on April 3, 2020, noting that the BOP system was "experiencing significant levels of infection at several. . . facilities, including FCI Oakdale."[7] Attorney General Barr went

---

[1] *See* Bureau of Prisons, Press Release: Inmate Death at FCI Oakdale I (Mar. 28, 2020), *available at* https://www.bop.gov/resources/news/pdfs/20200328_press_release_oak_death.pdf.
[2] *Id.*
[3] *Id.*
[4] Bureau of Prisons, *COVID-19 Update*, https://www.bop.gov/coronavirus/ (last accessed Apr. 30, 2020)/.
[5] *Id.*; *see also* Bureau of Prisons, Press Release: Inmate Death at FCI Oakdale I (Apr. 15, 2020), *available at* https://www.bop.gov/resources/news/pdfs/20200415_press_replase_oak.pdf (announcing the death of Michael Lilly, a 55 year-old man serving a 300-month sentence); Bureau of Prisons, Press Release: Inmate Death at FCI Oakdale I (Apr. 10, 2020), *available at* https://www.bop.gov/resources/news/pdfs/20200410_press_release_oak.pdf (announcing the death of George Jeffus, a 76 year-old man serving a 60-month sentence); Bureau of Prisons, Press Release: Inmate Death at FCI Oakdale I (Apr. 3, 2020), *available at* https://www.bop.gov/resources/news/pdfs/20200403_press_release_oak.pdf (announcing the death of Wallace Holley, Jr., a 56 year-old man serving a 336-month sentence); Bureau of Prisons, Press Release: Inmate Death at FCI Oakdale I (Apr. 2, 2020), *available at* https://www.bop.gov/resources/news/pdfs/20200402_press_release_oak.pdf (announcing the death of David Townsend, a 66 year-old man serving a 240-month sentence); Bureau of Prisons, Press Release: Inmate Death at FCI Oakdale I (Apr. 2, 2020), *available at* https://www.bop.gov/resources/news/pdfs/20200402_press_release_covid19_oak.pdf (announcing the death of James Wilson, a 57 year-old man serving a 135-month sentence); Bureau of Prisons, Press Release: Inmate Death at FCI Oakdale I (Apr. 1, 2020), *available at* https://www.bop.gov/resources/news/pdfs/20200401_press_release_oak_death_a.pdf (announcing the death of Nicholas Rodriguez, a 43 year-old man serving a 188-month sentence). Presumably, each sentencing judge believed that these sentences were sufficient but not greater than necessary to comply with the purposes of 18 U.S.C. § 3553. Not one death sentence was imposed yet each prisoner passed prematurely due to COVID-19 while serving their sentence.
[6] *Id.*
[7] Memorandum for Director of Bureau of Prisons: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19 (Apr. 3, 2020), *available at* https://www.justice.gov/file/1266661/download.

on to say that, "[w]hile BOP has taken extensive precautions to prevent COVID-19 from entering

its facilities and infecting our inmates, those precautions, like any precautions, have not been

perfectly successful at all institutions." He then directed immediate review of all "inmates who

have COVID-19 risk factors, as established by the CDC, starting with the inmates incarcerated at

FCI Oakdale. . . and similarly situated facilities."

Kelly mailed a letter to this Court on March 30, 2020, contending that he is eligible for

immediate release "due to the pandemic of Covid-19."[8] The letter arrived around April 7, 2020.[9]

The Court construed the letter as a motion brought under 18 U.S.C. § 3582(c)(1)(A), as amended

by the First Step Act of 2018 ("First Step Act"), Pub. L. No. 115-391, 132 Stat. 5194 (2018), and

docketed it as a motion for release that day.[10]

On March 31, 2020, Kelly also sent his Unit Manager a request under the First Step Act to

be placed on home confinement or in a halfway house. Docket No. 144-3. Kelly's request was

---

[8] As of that date, there were more than 164,000 cases and 3,000 deaths in the United States. *See Coronavirus updates from March 30, 2020*, CBS News (Mar. 30, 2020), https://www.cbsnews.com/live-updates/coronavirus-disease-covid-19-latest-news-2020-03-30/. Today's numbers dwarf those grim statistics. *See infra* note 12. The State of Louisiana alone had reported more than 3,500 cases and 151 deaths on March 30, 2020. *See* Sarah Ann Dueñas, *Coronavirus in Louisiana: Here's what we know on Monday, March 30*, Lafayette Daily Advertiser (Mar. 30, 2020), https://www.theadvertiser.com/story/news/2020/03/30/louisiana-coronavirus-cases-covid-19-update-gov-john-bel-edwards/2938235001/. Louisiana's governor lamented that "[w]e remain on a trajectory really to overwhelm our capacity to deliver health care by the end of the first week in April." *Id*. The State had become one of the country's "emerging coronavirus hot spots." *Why Louisiana is emerging as a major coronavirus hot spot*, PBS News Hour (Mar. 27, 2020), https://www.pbs.org/newshour/show/why-louisiana-is-emerging-as-a-major-coronavirus-hot-spot; *see also* Dan Goldberg et al., *Virus hot spots in South poised for disproportionate suffering,* Politico (Apr. 3, 2020), https://www.politico.com/news/2020/04/03/coronavirus-rural-south-164225. Today, there have been more than 27,700 cases of COVID-19 reported in Louisiana and 1,845 deaths. *See Coronavirus Disease 2019 (COVID-19): Cases and Deaths by State*, Centers for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us html (last visited May 1, 2020).

[9] It is not certain exactly when the letter was received by the Court. Because the letter was mailed directly to the chambers, it was not immediately processed as the undersigned and chambers staff have worked remotely since the effective dates of this Court's COVID-19 order. *See* No. 3:40-MC-11, Mar. 13, 2020 Order [52]. Mail directed to Chambers is not receipted daily.

[10] Our judges anticipated that many of those under its jurisdiction, like Kelly, would seek compassionate release under the newly enacted CARES Act because of the pandemic. Pursuant to the Court's General Order, the Federal Public Defender was appointed to represent Kelly. *See* No. 3:40-MC-11, Apr. 13, 2020 Order [56].

denied on April 5, 2020. He appealed the denial to the Warden. The Warden has yet to respond to

Kelly's appeal.

The Government opposes Kelly's motion. *See* Docket No. 143. The Government contends

that the First Step Act's exhaustion requirements are either jurisdictional in nature or a mandatory

claims-processing rule. Accordingly, it argues that because Kelly failed to exhaust administrative

remedies prior to filing the motion, the matter should be dismissed. In the alternative, the

Government argues that Kelly's motion fails on the merits.

Kelly contends that the First Step Act's exhaustion requirements are non-jurisdictional.

While he concedes that he failed to exhaust, he argues that this failure should be excused "in light

of the COVID-19 pandemic" or that an equitable exception should apply. Kelly further argues that

he is entitled to his motion for release on the merits.

## II.     Legal Standards

Generally, a "court may not modify a term of imprisonment once it has been imposed." 18

U.S.C. § 3582. Federal law provides three exceptions:

> (1) upon a motion by the Bureau of Prisons or the defendant for reduction of sentence under 18 U.S.C. § 3582(c)(1)(A);
> (2) "to the extent otherwise expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure," 18 U.S.C. § 3582(c)(1)(B); or
> (3) where the defendant was sentenced based on a retroactively lowered sentencing range, 18 U.S.C. § 3582(c)(2).

18 U.S.C. § 3582.

Under Section 3582(c)(1)(A), the defendant may move for a reduction of sentence after

either (1) "the defendant has fully exhausted all administrative rights to appeal a failure of the

Bureau of Prisons to bring a motion on the defendant's behalf" or (2) "the lapse of 30 days from

the receipt of [a request to the Bureau of Prisons to bring a motion on the defendant's behalf] by

the warden of the defendant's facility," whichever is earlier.

 The court may reduce a sentence under Section 3582(c)(1)(A) "if it finds that extraordinary and compelling reasons warrant such a reduction" and "that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." The Court must "also consider[] the factors set forth in 18 U.S.C. § 3553(a) to the extent that they are applicable." 18 U.S.C. § 3582(C)(1)(A).

## III.   Discussion

### A.   Failure to Exhaust

#### 1.   Is the Statute Jurisdictional?

The first question is whether the First Step Act's exhaustion requirements are jurisdictional. *See Ashford v. United States*, 463 F. App'x 387, 391–92 (5th Cir. 2012) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998)).

Exhaustion requirements can either be (1) jurisdictional, meaning the rule "governs a court's adjudicatory capacity, that is, its subject-matter or personal jurisdiction," or (2) a "[c]laims-processing rule[], which are rules 'requiring that a party take certain procedural steps at certain specified times.'" *Nat'l Football League Players Ass'n v. Nat'l Football League*, 874 F.3d 222, 226–27 (5th Cir. 2017) (citing *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435 (2011)). Claims-processing rules "are not jurisdictional—even if mandatory—unless Congress clearly indicated the rule was 'jurisdictional.'" *Id.* at 227.

The Court "analyze[s] the text of this particular provision to determine whether the provision 'was meant to carry jurisdictional consequences.'" *Louisiana Envt'l Action Network v. City of Baton Rouge,* 677 F.3d 737, 747 (5th Cir. 2012) (citing *Henderson*, 562 U.S. at 438)).

Section 3582(c)(1)(A) provides:

(c) Modification of an imposed term of imprisonment. – The court may not modify a term of imprisonment once it has been imposed except that–

(1) in any case–

>   (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable

18 U.S.C. § 3582(c)(1)(A).

This language "does not 'clearly state[]' that the [exhaustion requirement] is jurisdictional." *Louisiana Env'l. Action Network*, 677 F.3d at 748 (quoting *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 515 (2006)). "This provision 'does not speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts.'" *Id.* (quoting *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 394 (1982)). Thus, the language of § 3582(c)(1)(A) does not provide a clear indication that Congress intended the provision to be jurisdictional.

Accordingly, Section 3582(c)(1)(A)'s exhaustion requirement is a non-jurisdictional claims-processing rule.

### 2.    Is Exhaustion Mandatory?

The next question is whether Section 3582(c)(1)(A)'s exhaustion requirement is mandatory or optional. If the latter, exhaustion is potentially subject to equitable exceptions.

The Government argues that Section 3582(c)(1)(A)'s exhaustion requirement is "a mandatory claims-processing rule that must be enforced if, as here, it is invoked by the United States." They cite to *Ross v. Blake*, where the Supreme Court held that a federal court could not

excuse the exhaustion requirements of the Prison Litigation Reform Act (PLRA), 42 U.S.C. §

1997e(a), under an unwritten "special circumstances" exception. 136 S. Ct. 1850, 1855 (2016).

The PLRA provides: "No action shall be brought with respect to prison conditions under

section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or

other correctional facility until such administrative remedies as are available are exhausted." 42

U.S.C. § 1997e(a). In *Ross,* the Supreme Court held that,

> the statute contains one significant qualifier: the remedies must indeed be
> "available" to the prisoner. But aside from that exception, the PLRA's text suggests
> no limits on an inmate's obligation to exhaust—irrespective of any "special
> circumstances." And that mandatory language means a court may not excuse a
> failure to exhaust, even to take such circumstances into account.

136 S. Ct. at 1856 (internal citations omitted).

Section 3582(c)(1)(A) is not so strict. It allows a prisoner to fully *bypass* the exhaustion

requirement. A defendant must either fully exhaust the BOP's usual administrative process *or* wait

30 days after the warden receives the defendant's request to bring a motion for a sentence

reduction.

Accordingly, Section 3582(c)(1)(A)'s exhaustion requirement is not mandatory but rather

one of two options available to a defendant seeking compassionate release.

### 3.    Are Equitable Exceptions Available?

As other courts have noted about Section 3582(c)(1)(A), "such a provision is extremely

unusual (if not unprecedented) as an element of an administrative exhaustion provision." *United

States v. Russo*, No. 16-CR-441 (LJL), 2020 WL 1862294, at *6 (S.D.N.Y. Apr. 14, 2020) (citation

omitted). The most analogous statutory provision this Court could find is the bypass provision of

the Age Discrimination in Employment Act (ADEA). That statute provides:

> When the individual has not filed a complaint concerning age discrimination with
> the Commission, no civil action may be commenced by any individual under this

7

section until the individual has given the Commission not less than thirty days' notice of an intent to file such action.

29 U.S.C. § 633a(d). As the Fifth Circuit has explained,

> [A federal] employee who believes that he has been discriminated against because of his age has two avenues of relief. He may file an administrative complaint with the employing federal agency, and if the employing agency's determination is adverse to him he may appeal to the [Commission] for administrative review. After the administrative complaint has been filed with the Commission, a civil action then may be instituted. Alternatively, the employee has the option under the Act to bypass the administrative process either in part or in its entirety and proceed directly to federal court thirty days after notice of intent to sue has been given to the Commission as long as such notice is given "within one hundred and eighty days after the alleged unlawful practice occurred."

*Paterson v. Weinberger*, 644 F.2d 521, 523–24 (5th Cir. 1981) (internal citations omitted). In

*Paterson*, the Fifth Circuit further noted that equitable exceptions to those paths may be available

under the ADEA. *Id.* at 524 ("Plaintiff was required to seek relief through one of the two avenues

described or alternatively claim equitable grounds for not having so proceeded.").

Section 3582(c)(1)(A) similarly provides a defendant "two avenues of relief": (1) fully

exhaust the usual BOP process, or (2) "bypass the administrative process" by filing a request with

the warden and waiting 30 days. *Id.* at 523. Like the ADEA, equitable exceptions to exhaustion

are available under Section 3582(c)(1)(A). *See Paterson,* 644 F.2d at 524*; see also Forester v.*

*Chertoff*, 500 F.3d 920, 929 (9th Cir. 2007) ("[W]e hold that the time prescriptions in 29 U.S.C. §

633a, including the 30–day waiting period, are not jurisdictional and may be forfeited, waived, or

equitably modified."). Additionally, as other courts have noted, Section 3582(c)(1)(A) "has

features both of an administrative exhaustion requirement and of a timeliness statute, [a]nd

equitable exceptions plainly apply to the latter." *United States v. Bess*, No. 16-CR-156, 2020 WL 1940809, at \*7 (W.D.N.Y. Apr. 22, 2020) (quotation marks and citations omitted).[11]

Given the foregoing, equitable exceptions may be available.

### 4.    Has Kelly Met the Standard for Equitable Relief?

In these situations, other courts have applied the "equitable tolling" standard given Section 3582(c)(1)(A) has the features of a timeliness statute. *See, e.g., Bess*, 2020 WL 1940809, at \*7. "For this narrow exception to apply, a plaintiff must show '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing.'" *Sandoz v. Cingular Wireless, L.L.C.*, 700 F. App'x 317, 320 (5th Cir. 2017) (citation omitted).

Here, Kelly meets both elements. Prior to this motion being filed on April 7, 2020, Kelly began the administrative process to request relief and was denied at its first stage. He has since appealed the decision and still awaits an answer from the warden. Accordingly, he has diligently pursued his rights.

---

[11] To the extent relevant in this Circuit, the application of equitable exceptions to Section 3582(c)(1)(A) is also consistent with Congressional intent. The Court agrees with Judge Vilardo and Judge Nathan that Section 3582(c)(1)(A) was "designed to 'enhance public safety' and 'make[] . . . changes to Bureau of Prisons' policies and procedures to ensure prisoner and guard safety and security.'" *Bess*, 2020 WL 1940809, at \*7 (citing *United States v. Scparta*, No. 18-CR-578 (AJN), 2020 WL 1910481, at \*7 (S.D.N.Y. Apr. 20, 2020) (alteration in original) (quoting H.R. Rep. No. 115-699, at 22 (2018)). "Neither purpose is served by keeping a vulnerable individual incarcerated in precarious conditions that pose risks to not only his own health and safety, but also to the health and safety of the prison staff and the communities to which they return each day." *Id.*

The COVID-19 pandemic constitutes an "extraordinary circumstance" that prevented his timely filing. As the Fifth Circuit recently noted, "our nation faces a public health emergency caused by the exponential spread of COVID-19." *In re Abbott*, 954 F.3d 772, 779 (5th Cir. 2020). The court observed that "[a]s of April 6, 2020, over 330,000 cases have been confirmed across the United States, with over 8,900 dead." *Id.* In the 25 days since the Fifth Circuit shared these statistics, there have been over 700,000 new cases of COVID-19 in the United States and more than 51,000 additional deaths from the virus.[12]

These numbers are not mere abstractions for Kelly. The facility where he is being held is the site of the first known BOP prisoner death from COVID-19.[13] 33 prisoners and 17 staff at the facility have tested positive for COVID-19, and seven prisoners have been killed by the virus. As this Court has noted before, "[i]ncarcerated populations are uniquely susceptible to COVID-19 because the most important strategy of physical distancing simply is not possible in prisons, jails, and detention centers." *United States v. Norbert*, No. 3:19-CR-50, Docket No. 42 at 4 (S.D. Miss. Apr. 8, 2020) (quotation marks and citation omitted). These "unprecedented circumstances" have "stood in [Kelly's] way and prevented timely filling." *In re Abbott*, 954 F.3d at 795; *see also Sandoz,* 700 F. App'x at 320.

---

[12] *Coronavirus Disease 2019 (COVID-19)*, Centers for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited May 1, 2020).
[13] Maurice Chammah, *Coronavirus Ended His Shot at a Second Chance*, The Marshall Project (Apr. 3, 2020), https://www.themarshallproject.org/2020/04/03/coronavirus-ended-his-shot-at-a-second-chance.

10

In short, it is appropriate and justice requires that we take up the merits of Kelly's motion.

*Bess*, 2020 WL 1940809, at *7.

### B.    Merits

#### 1.    Extraordinary and Compelling Reasons

For a Court to reduce a defendant's sentence under Section 3582(c)(1)(A), the defendant

must demonstrate that "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C.

§ 3582(C)(1)(A)(i). The defendant must also show "that such a reduction is consistent with

applicable policy statements issued by the Sentencing Commission." *Id.* § 3582(C)(1)(A).

"To determine what the Sentencing Commission considers 'extraordinary and compelling,'

the Court turns to United States Sentencing Guidelines § 1B1.13." *United States v. Cantu*, 423 F.

Supp. 3d 345, 349 (S.D. Tex. 2019) (citing 28 U.S.C. § 994(t)). "However, the Sentencing

Commission's policy statements have not been amended since the enactment of the First Step Act,

and consequently, a portion of the policy statement now squarely contradicts 18 U.S.C. §

3582(c)(1)(A) as amended." *United States v. Perdigao*, No. CR 07-103, 2020 WL 1672322, at *2

(E.D. La. Apr. 2, 2020). The Court agrees with Judges Fallon, Eagles, and others that "this

discrepancy means that the Sentencing Commission does not have a policy position applicable to

motions for compassionate release filed by defendants pursuant to the First Step Act." *Id.* (citation

omitted). "While the old policy statement provides helpful guidance," *United States v. Beck*, 425

F. Supp. 3d 573 (M.D.N.C. 2019), numerous other courts who have ruled on this issue have held

that they have the "discretion to determine what constitutes an 'extraordinary and compelling

reason[]' on a case by case basis, and reliance on the policy statement may be helpful, but not

dispositive," *Perdigao*, 2020 WL 1672322, at *2 (citation omitted); *see also United States v.*

*Haynes*, No. 93 CR 1043 (RJD), 2020 WL 1941478, at *14 (E.D.N.Y. Apr. 22, 2020) (collecting cases).

Sentencing Guidelines Section 1B1.13 outlines four circumstances that constitute "extraordinary and compelling reasons" and thus warrant a sentence reduction. These are: (1) the defendant's medical condition; (2) the defendant's age; (3) family circumstances; and (4) other reasons as determined by the Director of the Bureau of Prisons.

None of these circumstances apply in Kelly's case, as he implicitly concedes. Instead, Kelly contends that the COVID-19 pandemic and what he characterizes as the "BOP's inadequate response" qualify as "extraordinary and compelling" reasons.

Kelly's argument is novel. In virtually all of the cases in which an individual has been released at least in part due to the COVID-19 pandemic, the prisoner suffered from health issues or an advanced age that placed the prisoner under a "the heightened risk of severe illness" given what we now know about who is most susceptible to the virus.[14] *United States v. Colvin*, No. 3:19-CR-179 (JBA), 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020); *see also, e.g., United States v. Scparta*, No. 18-CR-578 (AJN), 2020 WL 1910481, at *2 (S.D.N.Y. Apr. 20, 2020) ("Mr. Scparta is 55-years old and suffers from high blood pressure, high cholesterol, sleep apnea, and hypertension, and he therefore contends that he is susceptible to serious injury or death if he contracts the disease."); *United States v. Zukerman*, No. 16 CR. 194 (AT), 2020 WL 1659880, at

---

[14] *Coronavirus Disease 2019 (COVID-19): People Who Are at Higher Risk for Severe Illness*, Centers for Disease Control https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk html (last visited Apr. 30, 2020). Having said that, we simply don't know all that we don't know about this disease. *See* Clifford Marks and Trevor Pour, *What We Don't Know About the Coronavirus*, The New Yorker (Apr. 29, 2020), https://www newyorker.com/science/medical-dispatch/what-we-dont-know-about-covid-19; *see also* David Wallace-Wells, *We Still Don't Know How the Coronavirus Is Killing Us*, N.Y. Mag. (Apr. 26, 2020), https://nymag.com/intelligencer/2020/04/we-still-dont-know-how-the-coronavirus-is-killing-us html; Charlie Warzel, *When Will Life Be Normal Again? We Just Don't Know*, N.Y. Times (Apr. 13, 2020), https://www nytimes.com/2020/04/13/opinion/coronavirus-what-we-know.html.

*4 (S.D.N.Y. Apr. 3, 2020) ("Zukerman's advanced age and compromised health, combined with the high risk of contracting COVID-19 at Otisville, justify waiver of the exhaustion requirement.").

Despite his youth and lack of health issues, Kelly argues that he is still at a high risk of while incarcerated at Oakdale I.[15] The Court agrees. There is more to his argument than the "mere existence of COVID-19 in society and the possibility that it may spread to a particular prison." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Those factors alone "cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Id.* Here, however, it has become increasingly apparent that the BOP has failed to control the outbreak at Oakdale I. Despite the BOP's efforts, COVID-19 has continued to spread at the facility and more prisoners have died.[16] In fact, almost a quarter of COVID-19-related prisoner deaths reported by the BOP have occurred at Oakdale I.[17]

Given the steadily growing death toll and the apparent continued spread of the disease at Oakdale I, COVID-19 creates an "extraordinary and compelling reason" potentially warranting a reduced sentenced.

### 2. Safety to Others and Community

The analysis is not complete. A defendant seeking compassionate release must also demonstrate that he "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13. "Section 3142(g) requires the court to

---

[15] Young persons are not immune. *See* Ariana Eunjung Cha, *Young and middle-aged people, barely sick with covid-19, are dying of strokes*, Wash. Post (Apr. 25, 2020), https://www.washingtonpost.com/health/2020/04/24/strokes-coronavirus-young-patients/; *see also* Christine McCarthy, *Young, middle-aged people hospitalized with coronavirus at high rates*, Bos. 25 News (Apr. 28, 2020), https://www.boston25news.com/news/health/young-middle-aged-people-hospitalized-with-coronavirus-high-rates/WLAIK65QEJGW3BN2M2NGZZROYQ/; William Feuer, *WHO says 'more and more' young people are dying from the coronavirus*, (Apr. 3, 2020), https://www.cnbc.com/2020/04/03/who-says-more-and-more-young-people-are-dying-from-the-coronavirus html.
[16] *See* Memorandum for Director of Bureau of Prisons: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19 (Apr. 3, 2020), *available at* https://www.justice.gov/file/1266661/download.
[17] Bureau of Prisons, *COVID-19 Update*, https://www.bop.gov/coronavirus/ (last accessed Apr. 30, 2020)/ (reporting 33 prisoner deaths in the BOP system).

13

consider factors such as the nature and circumstances of the charged offense, the history and characteristic of the defendant, and the nature of seriousness of the danger to a person or the community at large posed by the defendant's release." *Perdigao*, 2020 WL 1672322, at *2 (citing 18 U.S.C. § 3142(g)).

Here, Kelly pled guilty to one serious, violent crime. While this weighs against finding that Kelly is not a danger, the Court notes that Kelly has kept a clean conduct record absent one offense at the beginning of his incarceration, and the Government does not argue otherwise. He has been incarcerated for over 80 months and his projected release date is in less than three weeks given his earned Good Conduct Time and jail credit. During his incarceration, he has taken substantial advantage of prison programming and educational courses. Accordingly, the Court finds that Kelly does not pose a risk to others or to his community if released.

### 3.    Section 3553(a) Factors

"Section 3553(a) requires a court to consider certain factors when imposing a sentence, including the nature and circumstances of the offense and history and characteristics of the defendant, the need for the sentence, and the variety of sentences available." *Id.* at *4.

"Because this Court sentenced [Kelly], the Court is intimately familiar with how these factors apply to his circumstances." *Scparta*, 2020 WL 1910481, at *8. Kelly was convicted of a serious offense, as the Court made clear at his sentencing hearing. However, he pled guilty and accepted responsibility for his conduct in person before the Court. *See* Docket No. 119 at 28–29. Kelly had no prior convictions, resulting in a criminal history score of zero at the time of his sentencing, and there were no identifiable victims of the offense of his conviction.

At Kelly's sentencing, the Court noted it would recommend he be held at a facility that allowed him to remain close to his children, stating:

> You need to make sure that you continue to have a relationship with your children. And you explain to them that you are responsible for where you are [a]nd you have a long life ahead of you after this period of time. You are a very young man. You have a long life ahead of you, so you make sure that you live the rest of your life much better than what you did on that night.

Docket No. 119 at 39. Upon review of the parties' submissions and attachments, it appears that Kelly has done just that with his time of incarceration. Based on his record, which the government has not refuted, he has been a model prisoner and would not pose a danger to the public if released. He apparently sought to be rehabilitated. Moreover, he has a verified reentry plan and plans to live with his brother, who is a police officer.

In short, the Court has reconsidered the § 3553(a) factors in light of the extraordinary circumstances created by the COVID-19 pandemic at Oakdale I, and concludes that they warrant compassionate release in this case.

## IV.    Conclusion

For the reasons stated above, Kelly's motion for compassionate release is **GRANTED**. The Court therefore **RESENTENCES** Kelly to time served and that his 36 months of supervised release under the conditions in the original judgment shall commence immediately upon release from incarceration. The mandatory conditions, standard conditions, and special conditions of supervised release from Kelly's original sentence are again imposed.

The Government is **ORDERED** to release Kelly from custody immediately. To protect Kelly, his family, and the public, the Court will require he self-isolate for 14 days at his brother's home or other location the Probation Office deems proper.

It is **FURTHER ORDERED** that the parties shall meet and confer and submit a proposed order governing the conditions of Kelly's release, including his period of 14 days of self-isolation, no later than May 5, 2020, at 12:00 P.M.

**SO ORDERED,** this the 1st day of May, 2020.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE